May it please the court, I'm Jonathan Kibler from the Kibler Law Office in Marion, Illinois. I represent the Respondent of Health, Dr. Keith Thomae, in this appeal from the Circuit Courts in Madison County. Dr. Thomae's appeal arises out of two contemporaneously filed pro se post-dissolution motions to modify child support. In her brief, I believe the petitioner aptly concurred on the issues to be presented to the court. The issues are factual, therefore the standard of the review is manifest way to the evidence. The standard calls for deference in reviewing the sufficiency of the evidence to support the trial court's finding of fact. In order to prevail, we must look at the evidence in the light most favorable to the appellee, and see if the conclusion opposite to that of the trial court is clearly apparent, or if the findings are palpably erroneous and wholly unwarranted, clearly the result of passion or prejudice, or appear to be arbitrary and unsubstantiated by the evidence. The first point of error by the trial court was its determination that the appellant terminated his employment in bad faith. On July 22nd, 2014, the trial court entered into order, quote, pursuant to the court's order of May 14, 2014, on petitioner's petition for 503G trust, contempt, and sentencing on contempt, and a ruling on previously heard matters taken under advisement following the prior evidence being heard on February 20th, 2014, end quote. The court denied the appellant's motions in that order to modify his child support payment obligations. Stating on page 2, paragraph 1 of the order, quote, the court finds that the respondent's termination of his previous employment at Scottsdale County Hospital was by his own admission voluntary, and can serve as a basis to modify his support obligations. The court finds on the testimony that the voluntary termination of that employment by a respondent was, in part, a bad faith attempt to avoid his ongoing financial obligations here, end quote. The trial court then held the appellant in contempt, found an outstanding child support obligation of $63,957.86, as having accrued since the previous fall when the motions were filed, and ordered the appellant's business-owned hobby aircraft to be placed into a 503G trust. Judge Heflin explained her ruling on September the 17th, 2014, at a hearing held on appellant's timely filed post-trial motion. Let me read her statement to you from R122 to 24, which can be found at page 6 of appellant's brief. Quote, Dr. Tomei would have this court believe that he can only afford $500 a month in child support, yet his business can maintain a private plane to save him time because his time is so valuable. And he can maintain a private plane that's paid off, but he can only pay $500 a month in child support for five minor children. The court did not find any of this testimony credible, period. The lifestyle that he leads, you know, I've been doing this for a while, and you don't live the lifestyle he leads on $1,000 a month. And you don't come in and talk to a judge who practices family law, and who's been on the family law bench for as long as I've been, and try to convince me that there's some difference between the business entity and him when he controls the business entity. So it was really an issue of credibility with Dr. Tomei. And the court, as far as modifying child support, frankly couldn't determine what his income was. And it's his work to prove that there's been a change, and not to come in and try to mislead the court in regard to his lifestyle and what that business is actually generating. And I took that into consideration, the whole credibility issue, in terms of his testimony regarding the reasons that he quit his employment, end quote. Based on the court's statement, the court gave Appellant's testimony in no way because of the court's perception of his supposed lifestyle, his stated income, and his assertion as a pro se litigant that his business entity owned the amateur plane, which law on the subject was truthful, but in our form, the way that pro se litigants can sometimes be. Do you agree, Mr. Kibler, that this court is to give deference to the trial court as to its findings of credibility? Yes, Judge, great deference. It can only be overturned if we look at the trial court's ruling in the light most – look at the evidence in the light most favorable to the prevailing party, and there's some clearly apparent opposite conclusion that should have been reached. Or we have a manifest weak standard. Yes, Judge, absolutely. Go ahead. Thank you, Judge. So we must review these reasons to see whether a conclusion opposite to that of the trial court is clearly apparent, or if the findings are probably erroneous and wholly unwarranted, clearly the result of passion or prejudice, or appear to be arbitrary and unsubstantiated by the evidence. And I'm going to urge the court to find that each of those conditions exists. Because Judge Heflin's initial finding of bad faith on the appellant's evidence with regard to his income and assets, we must turn to that issue in order to resolve whether or not the court's finding of bad faith termination and appellant's termination of employment with Scotland County was against the manifest way. This brings me to the second point of error. The court error in finding that it could not determine the appellant's income. We continue as before with the manifest way standard. The evidence was this at the hearing. Respondent appellant received a disproportionate burden of direct debts in the divorce decree, and petitioner appellate received a disproportionate award of marital assets. Respondent appellant's business in Highland collapsed at or after the time of his divorce from petitioner appellate. Appellant filed for bankruptcy in early 2012 and received a discharge. The marital residence that had been awarded to him together with its debt was foreclosed upon. Dr. Tomei moved to Memphis, Missouri in mid-2012 to work at Scotland County Hospital and paid substantial child support through his employment. In fall 2013, Dr. Tomei filed pro se motions to modify child support terminating his employment with Scotland County Hospital, and he moved to the St. Louis area. On February 1, 2014, Dr. Tomei opened his own practice in St. Louis named Tomei Surgical and located at 3533 Dunn Road, Suite 210. Tomei Surgical is a subsidiary of Xerez. A business entity awarded Dr. Tomei in the divorce decree. At the time of the hearing, on February 20, 2014, the doctor had taken a call at a single hospital and was seeking privileges at other hospitals. Appellant incurred startup-related expenses such as marketing. He testified further that he was paying himself $2,000 per month as a salary from Xerez, and that he had no other bank accounts other than an account for Xerez and a personal account. Bank statements for the business and personal accounts were submitted as Respondents 1 and 2 and Petitioners Group Exhibit A. These statements covered a time from December 2013 through the end of January 2014. With these statements, the Respondent Appellant testified of the following. In the month of January, Xerez received $11,090.40 from patients. Between December 7, 2013 and January 8, 2014, he made deposits to his personal bank account of $1,200, $1,000, and $900, respectively. He could not remember the source of those payments occurring on or before January 8, as of the hearing date of February 20, 2014. Between January 9 and February 7, 2014, he made deposits to his personal bank account of $100, $600, $1,000, and $2,000. The $2,000 deposit was the amount he was taking as payroll during his startup with Tomei Surgical. The deposit occurred via ATM on January 21, 2014 and corresponds with the bank statement from Xerez. He was uncertain about the source of the other funds as of February 20, 2014, but knew that not all of the other ATM deposits came from the Xerez account. Finally, he kept a couple of thousand dollars in cash at his personal residence. It was undisputed that beginning in the second half of 2012, he made at least $226,000 a year. It seems that there should be nothing nefarious about having some petty cash in such a situation. That was the total of evidence presented by both Appellate and Appellee regarding income from December 2013 to February 20, 2014. So despite the court's statement that the court, as far as modifying child support, frankly couldn't determine what his income was, sufficient evidence was presented to the court to determine the respondent's income. Viewing the evidence in a light that was favorable for him and Barney, Dr. Tomei terminated employment with Scotland County Hospital on October 21, 2013. He received deposits to his personal accounts during the months of December and January in amounts of $1,200, $1,900, $100, $600, $1,000, $2,000, some of which were definitively from Xerez and some of which he was uncertain as to the source of. The total of these amounts was $6,800. No evidence was put on about statutory deductions for gross debt. His statutory net income, therefore, would be $3,400 per month as of the date of the hearing on February 20, 2014. In the month of January, Xerez took in $11,090 from patients. On February 1st, the doctor had opened his surgical office. A reasonable trier of fact would infer that the opening, marketing, and operating of a professional doctor's office in the St. Louis area would incur substantial costs and that the amount that he had paid himself from Xerez was reasonable income from the business. None of those facts were addressed by the court. Reviewing the evidence in the light that was favorable to the prevailing party and opposite conclusion is clearly apparent. It was possible for the court to determine the respondent's income based on the evidence provided. The trial court's failure to do so in the light of the evidence presented and its finding that it could not determine his income was arbitrary, unsubstantiated by the evidence, palpably erroneous, and wholly unwarranted, appearing in light of the court's unfounded, quote, luxurious lifestyle comment to be made as a result of passion or prejudice. Now, this is the context for the court's statement that it did not find any of the appellant's testimony credible, and it took that into consideration in terms of his testimony regarding the reasons that he quit his employment, that language being from the court's order. Once the income credibility finding is set aside, we turn back to the first issue, which is whether the court erred in finding that the voluntary termination of the employment by a respondent was, in part, a bad faith attempt to avoid his ongoing financial obligations therein. In 2005, this court reviewed the applicable case law in intermarriage of broths with a court like the citation. At this time? No. Is it in the brief? Yes, Your Honor. We have it. There, you state in the law as follows. The circuit court's order for child support may be modified upon a showing of a substantial change in circumstances. A good faith voluntary change in employment, which results in diminished financial ability, may constitute a substantial change in circumstances justifying a reduction in child support payments. The crucial consideration to determine if a decision was made in good faith is whether the change was prompted by a desire to evade financial responsibilities for support of the children or otherwise to jeopardize their interests. The party seeking the modification must present evidence of a motive other than evasion of financial responsibilities for support of the children in support of the petition for modification. Unless good faith is shown, a voluntary termination of employment by a supporting spouse is not considered a material change in circumstances sufficient to warrant abatement or a modification of support obligations. When this court applied the law on broths, it considered the following factors applicable to that case. Whether or not the petitioner had been employed in a higher-paying job before changing jobs, whether the petitioner moved away from her children and parents for the new job, whether the new job had a lower rate of pay, whether the petitioner's goals and ambitions in changing jobs were unreasonably vague, inconclusive, and not credible, and whether the express motive for changing jobs could have been satisfied more closely in the county of residence of the petitioner and my own children. In this case, the public presented evidence that following his divorce, his then-medical practice and partnership experience financially really dissolved. He then sought employment in Missouri as a surgeon at a hospital. His income while still employed was substantial and resulted in a monthly child support payment of $6,381.78. Attempting to exercise as much visitation as possible in view of his duties as a surgeon, he received visitation only nine days off, five days on schedule. Another surgeon of inferior skill was employed during the time he enjoyed visitation with his children. The surgeons shared patients with the appellant, and as a result of the surgeon's inferior work, Respondent was implicated in medical malpractice. Respondent feared that his license to practice medicine was in danger as a result of his continued employment at Scotland County Hospital. Respondent further believed Scotland County Hospital to be in financial hardship, and he was concerned that they would substantially cut his rate of pay. Finally, the children of Respondent requested that he be physically closer to them. The Respondent terminated his employment on October 21, 2013. In seeking gainful employment, the doctor testified to the efforts, which I previously mentioned, to establish his own practice in St. Louis. These include opening an office, marketing, taking call at a hospital, and seeking privileges at other hospitals. He testified that things were rough financially, that he could not completely pay the amounts under the then current orders, but that he would have greater earning potential in the future. He substantiated his testimony with both personal and business bank statements. As a result of his financial condition, in an order to pay the November and December 2013 child support obligation, Respondent cashed out a retirement account worth at least $14,000 in December 2013 and surrendered the funds to Petitioner Appellee. All of this evidence went unrebutted at trial. The court, however, stated that she gave this evidence no weight. If the trial court had evaluated the evidence rather than declaring it to be of no weight, then it should have applied laws. Doing so now, in a light that was favorable to the prevailing body, the following facts are clear. The Respondent appellant was employed in a higher-paying job before changing jobs. He shared patients with another surgeon during the time that he enjoyed visitation with his children, and that other surgeon caused a medical malpractice issue. He had serious concerns about the continued effect that his current employment and the nine-day on, five-day off visitation schedule Thank you. You can finish your sentence. Thank you. The schedule would have on his license to practice medicine. Thank you. Thank you, sir. Counsel? Justice Goldman Ursh and Mr. Kibler, if it pleases the court, I agree with Mr. Kibler on a number of things. One, the burden is the manifest weight of the evidence. I'd like to read to the court Judge Heflin's rulings from the transcript on July 22, 2014. Judge Heflin, we are set today on various pending petitions, but before we proceed on those petitions, I'm going to make a ruling regarding the petitions that we have already had testimony on, which is specifically Dr. Thome's petition to modify child support. In regard to the motion to modify child support, Dr. Thome, I'm denying your motion to modify child support. The court finds you voluntarily quit your employment. The court believes that part of that was in a bad faith attempt to avoid paying child support for six children for whom you have always been the primary source of support. In regard to the petition for adjudication of indirect civil contempt, the court grants that as it pertains to non-payment of child support and specifically finds you, sir, in contempt of this court. At the conclusion of the hearing, Judge Heflin went on to say, Dr. Thome, the bottom line is that when you know you yourself are saying you're a great surgeon, you have five minor children, one child who has just turned 18. Those children need to be supported. That's number one. Number two, I understand your desire to be close to your children. I'll accept that. But the reality is that you cannot think it's reasonable to quit a $250,000-a-year job and stop supporting these children or paying $600 a month for six children because you want to be closer than five hours away. It defies reason that you think that it's practical and logical that you're paying $600 a month for five kids, but you own an $80,000 plane that you have to maintain and pay insurance on and pay fuel for for your convenience. It's illogical. It makes no sense. I know personally, and I'm pretty sure most of us in this room, can't go out and pay cash for a new car. You did. You say your business did, but your business bought a new car for your sister to use. So it's unreasonable for you to think that I'm going to believe you only make $1,200 a month. What was the date of that transcript? That's July 22, 2014. This is the one that was dissed and was filed as a supplemental record. It wasn't disputed that Dr. Thomae terminated his employment in October of 2013 and that it was purely voluntary. It was also not disputed that following the termination, he paid zero child support in October, November, and December. Once he was brought back in court and Judge Heflin had a talk with him, he did cash in the IRA or the 401K that he'd accumulated and paid that over. If we look, and I agree again, a key issue is credibility. The first thing we talk about is what Mr. Killer was talking about, the circumstances of his leaving the hospital. Dr. Thomae was requested to provide any and all communication between himself and the hospital regarding the terms of his employment and the termination of the employment. He acknowledged he didn't provide me any of the communication. The trial judge asked him, was there communication that you had to and from the hospital? He said, yes, there was. There were e-mails. The judge asked, did you provide those e-mails? The answer was, no, I didn't. Do you have those e-mails? Yes, I do, but I have not provided them. Based upon that, the judge, I think, was free to draw the inference that the reason the documents weren't produced is because they might not have been supportive of his position. In addition to no documents, he provided no witnesses. The only testimony that was presented as to the leaving of the employment was Dr. Thomae's own testimony. The second issue that we have to address that is replete throughout the history of this case is, was he attempting to evade financial responsibility? This case started out as a fairly conventional case. He was a practicing physician. My client was a retired nurse. They had six children at home, ranging in age from seven years of age to 15 years of age. The judgment was entered in August of 2011. Dr. Thomae was awarded the house, and he was awarded $4,078 in child support, which represented 50 percent of his net because there were six kids. The cost of the educational expenses were to be divided, split the health insurance costs, the rest of that. The difficulty we have is less than six months after the judgment, Annie had to file her first petition for contempt. He wasn't paying school expenses. He wasn't paying medical expenses. He wasn't paying activity expenses. That was filed in January of 2012. The question then becomes, in January of 2012, the divorce was entered in August of 2011, so we've got about six months. Did the doctor have the financial ability to pay? We heard about the bankruptcy and so forth. In November of 2011, the doctor had a separate piece of litigation where he was breaking up a medical practice with a former partner. In November of 2011, he received a distribution of $106,483 cash to him from the breakup of the medical practice. He clearly had the ability to pay. Interestingly, less than six months later, he files a Chapter 7 no-asset bankruptcy that went through. In June of 2012, Annie files her second petition for contempt, again, increasing amounts that are not being paid. In July of 2012, Judge Grounds, who had the case before Judge Heflin, had the case set for hearing. He said he could not have a hearing on the contempt because of the Chapter 7 bankruptcy, but he did review the doctor's income. He was then working at Scotland County Hospital, and based upon that, he increased the child support to $5,075 a month. Interestingly, Judge Grounds, in his order, found, Well, the judge was pretty smart because in February, we had another hearing, February of 2013, and the doctor had to produce his W-2. And his W-2 from Scotland County for 2012 was $227,000, and he didn't work the whole year. So when Judge Grounds said, In February of 2012, the father filed an emergency motion to modify child support. He wanted to have his child support reduced. We had a hearing in March of 2013, and this is when we were first able to have the hearing on the contempt because of the bankruptcy, they got kicked back and kicked back. On the hearing on contempt, Judge Grounds found that he had failed to reimburse health care expenses, activity expenses, and educational expenses, totaling $5,781. And he also had not paid, he had an order that he was to pay $1,000 a month for a property settlement. He hadn't paid that, so the total contempt was $15,781. Did he have counsel at that hearing? Sir? Did he have counsel at that hearing? He did not. No? With Judge Grounds? I'm not sure, Judge, I'm sorry. He filed that petition pro se. He filed that petition pro se. I think you're correct. He did not have counsel at that hearing. That's correct. And then based upon the evidence of what Judge Grounds then had, he increased the child support again to $6,381. So that's in March of 2013. He's found in contempt. He hasn't paid all these expenses for the kids, and the child support has increased again. And so in October of 2013, he quits his job, making over $250,000 a year. And we'll go back to the credibility. October 21st of 2013, he files a petition to modify, saying his income dropped from $11,500 a month to zero. A week later, he files a second motion to modify, Part 2, saying his income has dropped from $7,100 to zero. So within a week, he can't agree on what it was that he used to make. The issues to this point are clear that from the outset, within months of the initial judgment, there was nonpayment. There was nonpayment. There were attempts to reduce child support. There were requests for reduced child support. And when Judge Grounds heard it, found him in contempt, and said we're not going to reduce the child support, his next step was to quit his job. When he was before Judge Heflin, he was asked about the impact on the children. Question, did you think before you quit your job, making $250,000 per year, that it might have a negative impact on your kids? Dr. Thome answered, I knew it would not, and my kids are more important than money. Question, so who did you think is making up the shortfall for the $6,000 you didn't pay in November and December? Answer, the other person, because of $140,000 in the bank. Annie had been careful and had been banking as much of the child support as she could because she knew of his unreliability. Then we heard Mr. Kilgore arguing about all the evidence that was produced as to his income for starting a new practice. He quits a job, $250,000, doesn't pay for a couple of months, and then establishes his new practice. These were the questions and answers as to the clear documentation that he was to provide as to his income. He testified as to Respondents Exhibit 1, his Exhibit 1, his business bank account. He acknowledged that there were deposits of $3,900. When asked where did that money come from, Father stated, it came from payments from patients probably. Probably, I don't know, probably. And then on his business account from January of 2014, this is a month before the hearing, a month before the hearing, he brings in a couple of bank statements. He was asked about deposits of $11,090 as well as deposits to his personal account of $1,200, $1,000, $1,900. Where did these monies come from? His answer, I can't remember right now. It was a month before. He was then given his bank statements from January to February of 2014, again a month before the hearing. Deposits of $1,600, $2,000. Where did that money come from? I don't know. With the history of the doctor in not meeting his obligations, in asking to have his child support modified when he had a new job and was making more money, and then being found in contempt and not meeting that contempt obligation, and then in response to not getting relief from the court, quitting his job, I think the whole issue of credibility is resolved to the extent that Judge Heflin was quite correct, that the reason that he quit his job was at least in part to evade his financial responsibilities as he had been attempting to evade them since the entry of the judgment. I think on this evidence, with the deference that this Court has required, there's no way that you can find Judge Heflin's conclusions based on this evidence unless it be against the manifest way of the evidence, and we would ask for her judgment to be affirmed. Thank you. Thank you. Counsel? Opposing counsel has brought up a great many issues that do not appear on the face, entirely appear on the face of the record that Judge Heflin produced in terms of what she was thinking about the case, about the procedural history of the case at the time that she entered her order. First, there is no evidence, despite Judge Heflin's assertion, that my client was maintaining an $80,000 claim. The evidence was that there was a claim. Since that time, that claim has been put into a 503G trust, taken care of by opposing counsel's client, and been sold for an amount of $50,000 because the claim does not have its certifications done, had mechanical issues, and so on and so forth. So there's no evidence that he had some active income he was paying to maintain a piece of property with. The evidence is, at a certain point in time, he had a piece of property. The judge was free to make an inference about the discovery issue that opposing counsel raised. However, she did not do so in her order or in her statements. She did ask the questions that opposing counsel mentioned. She never made any ruling or order with regard to discovery sanctions, and she never, in the post-trial motion when she explained her ruling or in the order itself, mentioned the discovery issue opposing counsel has raised. So that's purely speculation on his part, and it's not supported by the record. With regard to my client not providing any witnesses other than himself, well, he is a witness in a court of law that does matter. He also supported his testimony with exhibits of his main statements for his business and for his personal income. Now, a reasonable trier of fact would understand that when a person goes to have surgery done, they're not paying cash under the table. They're working through an insurance company, and that money is going to end up in the business account. It's going to show up on the statement. So the idea that he was somehow hiding income at this time is totally unreasonable. He had $226,000 to $250,000 of income the previous year as a doctor. That was gross, not including the child support that he had paid regularly through that time, and he did have the means to purchase some things for himself or for his business at that time. The court could have looked at what assets he had, not his income, looked at his assets, and made a deviation from the guidelines and ordered an award of assets, but it didn't do that. It stated that he didn't present enough evidence to determine what his income was, and I think it's very clear to the court today, at least I hope so, that he did present that evidence. The issue of the bankruptcy has come up. The fact of the matter is that I was not his attorney at that time. He did not file a petition for him. I don't know the facts, but I do know that in terms of the timeline of when he was not employed and his practice fell apart to when he became employed at Scottsdale County, it's entirely possible that his debts could have been called in and totally reasonable that he could have been destitute. In fact, his house was foreclosed upon. The contempt issues that opposing parties raised that my client has evaded his financial responsibilities over were health care and other expenses in dispute in the amount of $5,000. Now, it is not difficult to imagine six children, two parties, lots of expenses being shared, and disputes coming up over them and those having to be resolved by the court. At no time prior to this, in October 21, 2013, did he fail to pay his child support. His child support was paid. In December of 2013, he cashed his retirement, and then he transferred that $14,000 to her to try to make good on outstanding child support obligations. This hearing was had in February of 2014. Since that time, he has worked to improve and increase his business. Prior to that, he represented himself pro se for at least a year and a half. A reasonable trial of fact would have found that the manifest weight of the evidence was in his favor. The trial of fact was not reasonable, and I urge the court to find that this case should be reversed on both points and, if necessary, remanded for further hearing. Thank you. Thank you, counsel. We appreciate the briefs and arguments of both counsel. We'll take the case under advisement. If there are no further oral arguments set before the court today, so be it adjourned.